**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| CHRISTINA LENEAU, | Civil No. 11-404 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |
| DCI PLASMA CENTER OF DULUTH, LLC, | |
| Defendant. | |

Stephanie M. Balmer, **FALSANI BALMER PETERSON QUINN & BEYER**, 306 West Superior Street, Suite 1200, Duluth, MN 55802, for plaintiff.

Jessica L. Durbin, Laura S. Weintraub, and Joseph J. Roby, Jr., **JOHNSON KILLEN & SEILER, PA**, 230 West Superior Street, Suite 800, Duluth, MN 55802, for defendant.

Plaintiff Christina LeNeau Was employed by defendant DCI Plasma Center of Duluth ("DCI") before being terminated in September 2009. LeNeau's complaint alleges that DCI's termination because she could not work without reasonable accommodations was in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A *et seq*. LeNeau also alleges that DCI retaliated against her because of her request for reasonable accommodation which would be a violation of Title I of the ADA. The Court will deny DCI's motion for summary judgment because there are genuine issues of material fact about whether DCI could have reasonably accommodated LeNeau's

disability and whether DCI terminated LeNeau because of her request for accommodation.

## BACKGROUND

*Underlying Events*

LeNeau began working for DCI in 1991 as a phlebotomist. (Decl. of Jessica L. Durbin, Ex. A, Dep. of Christine LeNeau 12:5-17, May 29, 2012, Docket No. 18.) Prior to 2001, LeNeau worked a series of related jobs, some at DCI, but starting in 2001, LeNeau worked exclusively at DCI as a physician substitute. (*See id.* 14:18-22, 18:14-24.)

In January 2005, LeNeau sustained a work-related injury to her shoulder while lifting a box. (*Id.* 24:24-25:13.) Due to the resulting work restrictions, LeNeau was absent from work from January 10, 2005 to March 11, 2005 and from April 20, 2005 to June 3, 2005. (*Id.* 26:14-20.) In addition, during the period LeNeau was back at work, she was subject to work restrictions limiting her hours and use of her arm. (Decl. of Carolyn Friedman, Ex. A, Dep. Exs., Ex. 4 (noting a return to work was allowed on March 16, 2005 with no left arm use, and another return to work was allowed on June 6, 2005 at four hours per day for two weeks, then six hour days after two weeks), May 25, 2012, Docket No. 14.) All restrictions were lifted in July of 2005. (*See id.*)

In late 2005,[1] due to continued problems with her shoulder, LeNeau's physician imposed new work restrictions. (*Id.* 34:3-9.) The restrictions included limitations on

---

[1] In July 2005, LeNeau injured her leg while horseback riding. (LeNeau Dep. 32:9-23.) Her doctors instructed that upon her return to work she should sit with her leg elevated ten out of

overhead activities and for a one month period, LeNeau was to be limited to four hour work days. (*Id.* & Dep. Exs., Ex. 6.) DCI accommodated these restrictions. (LeNeau Dep. 34:20-21.)

In 2006, as a result of surgery on her shoulder, LeNeau missed six weeks of work. (*Id.* 35:1-9.) When she returned to work, she was only able to work four and then six hour days. (*See id.*; Dep. Exs., Exs. 7, 10, 11.) These restrictions continued through much of 2007 and may even have been considered permanent. (*See* LeNeau Dep. 44:14-22.) Indeed, the workability forms did not have end dates. (*See, e.g.*, Dep. Exs., Exs. 10, 11.)

On May 31, 2008, LeNeau was in a motorcycle accident. (*Id.* 46:15-20.) She suffered a head laceration and traumatic brain injury, a fractured left thumb, and road rash. (*Id.* 46:25-27:4.) On July 14, 2008, LeNeau was cleared to return to work with only lifting restrictions. (*See id.* 47:15-20; Dep. Exs., Ex. 13.)

On April 10, 2009, LeNeau reinjured her shoulder at work in a collision with a patient. (LeNeau Dep. 6-7, 17; Dep. Exs., Ex. 14.) LeNeau next saw her physician on April 22 and at that point stopped working. (LeNeau Dep. 52:6-20.) LeNeau never returned to work at DCI. (*See id.* 53:9-15.)

On September 16, 2009, LeNeau received her sixth workability report, permitting her to return to work on September 29, 2009. (*Id.* 63:14-19; Dep. Exs., Exs. 18-21.) The report cleared LeNeau to work with the following restrictions: "sedentary duty. No use

---

every thirty minutes for three days. (*Id.*; Dep. Exs., Ex. 5.) LeNeau does not recall any issues with DCI accommodating this instruction. (LeNeau Dep. 33:20-23.)

[of] left arm. 4hrs/day[.]" (Dep. Exs., Ex. 21.) The report did not indicate an end date for the restrictions. (*See id.*) LeNeau immediately took this report to DCI and gave it to an assistant manager. (LeNeau Dep. 63:2-14.)

On September 21, 2009, LeNeau met with her manager and Carolyn Friedman, a human resources director for DCI's parent company, was present by teleconference. (*See id.* 72:14-73:4, 76:24-25.) Friedman informed LeNeau that DCI was terminating her employment. (*Id.* 46:24-77:4.)

DCI sent a follow up letter on September 24, 2009. (Dep. Exs., Ex. 22.) The letter noted that LeNeau had exhausted her vacation and leave under the Family Medical Leave Act and that her "leave options ha[d] long been exhausted." (*Id.*) The letter stated that DCI was terminating LeNeau because she had not returned to work on a full-time basis and DCI was "unable to accommodate" her work restrictions or "operate without three full-time physician substitutes." (*Id.*)

LeNeau was unable to find a new position until October 2010. (*See* LeNeau Dep. 71:5-9.) She continued to work with restrictions for some time after that but now works without restrictions. (*See id.* 71:17-21.)

*Job Description*

At DCI, a physician substitute is primarily responsible for "[d]onor safety, education, and welfare . . . thorough donor history and physical examinations, informed consents . . . management of donor reactions, evaluation of laboratory results and immunizations." (Decl. of Carolyn Friedman, Ex. B, Physician Substitute Job

Description ¶ 3.) The physician substitute must "[p]erform initial medical history and physical examination on new donors and annual examinations on repeat donors" (*id.* ¶ 4) and must "be able to assess donor reactions . . . to institute proper treatment promptly" (*id.* ¶ 6), including initiating emergency medical procedures (*id.* ¶ 7).

During her deposition, LeNeau described many of these procedures. (LeNeau Dep. 21:6-14.) The physical exam she performed included a general exam of the "eyes, ears, nose, throat, lungs, palpation of the abdomen, lymph nodes, reflexes, neurological, and assessing mental acuity." (*Id.*; *see also id.* 87:15-20.) LeNeau testified that she would not need two hands to conduct most of the physical exam but that two hands were needed to palpate the abdomen. (*See id.* 94:3-95:6.) LeNeau also explained how she would assess and react to donors' adverse reactions, including dizziness, nausea, fainting and seizures (*id.* 98:14-17); the physician substitute's job might be to make sure that the donor's legs are elevated, ice packs are applied, or the donor receives fluids (*id.* 100:23-101:8). DCI provided evidence that this care could also include "holding the donor's legs up, or securing a donor's arms" and that "this treatment, without exception, requires the use of two hands to be safe and effective." (Dolsen Decl. ¶ 14.) LeNeau also testified that working as a physician substitute typically required standing for three hours a day, sitting for three hours a day, and walking for about thirty minutes. (LeNeau Dep. 163:4-19l; *see also* Durbin Decl., Ex. B, Job Function Evaluation (describing the physician substitute position as three hours a day or sitting and standing and two hours a day of walking).)

The physician substitute must also perform "regular periodic checks of the donor floor to observe donors undergoing the electrophoresis procedure." (Physician Substitute Job Description ¶ 11.) DCI provided evidence that a physician substitute is "required to walk to the donor floor, sometimes with haste, to treat donors with adverse reactions." (Dolsen Decl. ¶ 13.)

At the "discretion of the Supervising Physician . . . the Physician Substitute may perform ancillary duties unrelated to his or her medical responsibilities." (Physician Substitute Job Description ¶ 12.) DCI presents evidence that physician substitutes at DCI are also expected to "fill in as Phlebotomists, Medical Receptionists, and Processing Technicians." (Decl. of Karen Dolsen ¶ 9, May 29, 2012, Docket No. 15; *see also* Friedman Decl. ¶ 11.) LeNeau testified that she "worked on the donor floor a lot" when she was not performing physical exams, usually as a phlebotomist. (LeNeau Dep. 108:17-20, 21-25.) A phlebotomist, medical receptionist, and processing technician typically stand or walk most of the day. (*Id.* 119:21-24, 121:8-11; 124:12-15; Friedman Decl., Ex. B, Phlebotomist Job Description (must be able to . . . [be] on his/her feet all day," Medical Receptionist Job Description (same), Processing Technician Job Description (same).[2])

During 2008 and 2009, all of DCI's physician substitutes except LeNeau were scheduled to work forty hours each week. (LeNeau Dep. 92:20-24; Friedman Decl. ¶¶ 12-13; Dolsen Decl. ¶ 5 (stating that, from 2005-2009, only LeNeau was scheduled to

---

[2] LeNeau signed each of these job descriptions.

work fewer than forty hours each week).)  A full-time position at DCI is at least thirty hours a week.  (Friedman Decl. ¶¶ 12-13; Dolsen Decl. ¶ 11.)

*Hire of Another Physician Substitute*

In May of 2009, while LeNeau was not working, Lisa Unger, a Regional Manager for DCI Biologicals, Inc. (Decl. of Lisa Unger ¶ 2, May 25, 2012, Docket No. 16) e-mailed Carolyn Friedman to ask if she could hire another physician substitute (Durbin Decl., Ex. C).  She noted that LeNeau had been referred to a surgeon for her shoulder injury again, that her appointment was not until the end of June, and that she would not be able to work during this time.  (*Id.*)  Friedman approved the hire of another physician substitute saying "we cannot go that long without coverage."  (*Id.*)[3]

DCI submits evidence that in the second quarter of 2009, the plasma center was very busy (*see* Unger Decl. ¶ 3) and that if LeNeau's restriction of part-time work was permanent, SCI would have had to hire an additional physician substitute (Dolsen Decl. ¶ 11).  DCI also contends that the previous part-time accommodations provided to LeNeau had created a "burden" for DCI.  (Friedman Decl. ¶ 13.)

*Claims Pled*

Count I of LeNeau's complaint alleges violations of Title I of the ADA, stating, "Defendant discriminated against Plaintiff by terminating her from her employment as a result of her disabilities and/or requests for reasonable accommodation of those

---

[3] LeNeau submits a job posting from October 4, 2009, advertising an open physician substitute at DCI.  (Decl. of Stephanie M. Balmer, Ex. B, June 20, 2012, Docket No. 22.)  It is unclear how long the position had been posted.

disabilities" (Compl. ¶ 13) and "Defendant's actions in terminating Plaintiff were in violation of Title I of the Americans with Disabilities Act of 1990, as amended" (*id.* ¶ 14).

Count II of the Complaint alleges violations of the MHRA, stating, "Defendant discriminated against Plaintiff by terminating her from her employment as a result of her disabilities" (*id.* ¶ 20) and "Defendant's actions in terminating Plaintiff were in violation of the Minnesota Human Rights Act" (*id.* ¶ 21).

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### II. LENEAU'S FAILURE TO ACCOMMODATE CLAIM

The ADA prohibits an employer from discriminating against an employee because of the employee's disability. 42 U.S.C. §§ 12101-12213. LeNeau pled that DCI

discriminated against her by terminating her because of her disabilities or request for accommodation for her disabilities,[4] in violation of the MHRA[5] and Title I. LeNeau frames her arguments in terms of DCI's failure to accommodate her limitations or engage in an interactive process to determine if it could accommodate her. *See Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) ("In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty – the failure to reasonably accommodate the disabled individual's limitations."). Accordingly, the Court finds that the discrimination claim under the ADA is properly considered within the failure to accommodate framework.[6]

In a reasonable accommodation case, the Court must apply a modified burden shifting analysis. *Id.* at 766. LeNeau must first show that she has an ADA disability and that she suffered an adverse employment action. *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). For the purposes of this motion, DCI does not contest

---

[4] An employer's failure to make a reasonable accommodation is a form of prohibited discrimination under the ADA. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)); *see also Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 870 (8th Cir. 2008) *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).

[5] "Claims under the MHRA are analyzed the same as claims under the ADA." *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001).

[6] The only specific allegation of discrimination in LeNeau's complaint and briefing is that she was terminated because of her need for a reasonable accommodation. To the extent that LeNeau has attempted to raise discrimination under the ADA unrelated to her accommodation request, she has failed to do so. Accordingly, the Court will treat her ADA allegations as a failure to accommodate claim.

either of these requirements. The sole issue is whether LeNeau was qualified, with or without reasonable accommodation, for a physician substitute position.

LeNeau must show[7] she is qualified to perform the essential functions of a physician substitute. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1032 (8th Cir. 2012); *Fenney*, 327 F.3d at 712. To be qualified within the meaning of the ADA, LeNeau must show that she (1) possesses "the requisite skill, education, experience, and training" for her position and (2) is "able to perform the essential job function, with or without reasonable accommodation." *Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (quoting *Fenney*, 327 F.3d at 712). DCI admits that LeNeau possessed the requisite skills, education, and experience necessary for the physician substitute position. LeNeau admits that she was not qualified without a reasonable accommodation, but she argues that a reasonable accommodation would have allowed her to meet the essential functions of the position.

LeNeau is only required to make a "facial showing that reasonable accommodation is possible." *Fjellestad v. Pizza Hut of Am.*, 188 F.3d 944, 950 (8th Cir. 1999). Once LeNeau makes that facial showing, "[t]he burden then shifts to the employer to show that it is unable to accommodate the employee." *Brannon*, 521 F.3d at 848 (internal quotation marks omitted). Whether a reasonable accommodation exists is often a fact question to be decided by the jury. *See Equal Empl't Opportunity Comm'n v.*

---

[7] "Although the plaintiff retains the ultimate burden of proving that he is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to put on some evidence of those essential functions." *Fenney*, 327 F.3d at 712 (internal quotation marks omitted).

*Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007); *see also Fjellestad*, 188 F.3d at (noting that an employer is not required to engage in an interactive process if "no reasonable accommodation was possible" but that the failure to engage in the process to "determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith") LeNeau argues that if DCI had engaged in an interactive process, it could have accommodated her restrictions, as it had numerous times before. DCI argues that no reasonable accommodation was available and so it is not liable for failing to engage in an interactive process.[8] *Fjellestad*, 188 F.3d at 952. Specifically, DCI argues that no accommodation would have allowed LeNeau to regularly and reliably attend work; conduct physical examinations of donors; provide appropriate care to donors who experienced adverse reactions; or fill in as a phlebotomist, medical receptionist, or processing technician. The Court will address each of these functions in turn.

### A. Regular Attendance at Work

DCI argues that LeNeau's could not perform her job because "regular attendance at work is an essential function of employment." *Brannon*, 521 F.3d at 849. DCI argues

---

[8] The Court finds that due to her history with DCI, LeNeau's submission of her workability form was a sufficient request for reasonable accommodation, requiring DCI to initiate an interactive process to determine appropriate reasonable accommodation.

that because LeNeau was unable to return to full-time work immediately, she was unqualified for her position.[9]

"[A]llowing a medical leave of absence [is] in some circumstances . . . a reasonable accommodation . . . ." *Id.* In *Brannon*, the Eighth Circuit found that the employee had failed to make a facial showing that she was a "qualified individual" because she had missed forty of the previous seventy-seven work days before her termination and she failed to demonstrate that her requested accommodation of additional time off would have enabled her to have consistent attendance at work. *Id.* at 848-49. In contrast, except when on injury-related leave, LeNeau had never had inconsistent attendance at work. Moreover, LeNeau was not even given an opportunity to talk to DCI about whether additional time off work would be a reasonable accommodation. This failure to engage in an interactive process is prima facie evidence that DCI might have been acting in bad faith. *Fjellestad*, 188 F.3d at 952. This failure to accommodate is particularly troubling because, after her previous injury-related absences, LeNeau had consistently worked the hours she was scheduled to work. This history suggests that an accommodation may have allowed LeNeau to return to a consistent work schedule, if DCI had engaged in an interactive process with her. Viewing the facts in the light most favorable to LeNeau, the Court finds that there is a factual dispute about whether LeNeau would have been able to return to work part-time after an additional medical leave of

---

[9] After her reinjury in April 2009, LeNeau began her medical leave on April 22. Her workability report of September 16, 2009 cleared her for four hours of work a day beginning September 28, 2009.

absence. In addition, DCI has not conclusively demonstrated that additional leave was an unreasonable accommodation.[10]

DCI also argues that working at least thirty hours a week was an essential function of the physician substitute position, and LeNeau was only cleared to work twenty hours a week. While the Court agrees that LeNeau would not have been able to work full-time, DCI has not shown that working thirty hours a week was an essential function of LeNeau's position. Indeed, DCI had permitted LeNeau to work twenty hours a week under previous work restrictions. The Court concludes that whether a reasonable accommodation existed to allow LeNeau to work the required hours of a physician substitute is a factual dispute, inappropriately decided on summary judgment, particularly since the facts must be viewed in a light most favorable to plaintiff.

### B. Other Essential Functions of the Physician Substitute Job

The parties also contest whether LeNeau was incapable of performing the non-attendance-related functions of the physician substitute job. "The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden." *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003). The principal disagreement about LeNeau's qualifications surrounds each party's understanding of LeNeau's physician-imposed restrictions of "sedentary duty" and "No use [of] left arm."

---

[10] Although DCI presented some data that it was uncharacteristically busy and it needed another full time physician substitute, it had not hired one in the time that LeNeau was on medical leave, and it did not provide anything demonstrating that a part-time physician assistant would have been insufficient.

The parties dispute whether LeNeau's need for "sedentary" work was inconsistent with the essential functions of her job. LeNeau insists that DCI should have sought a clarification of "sedentary" from her or her physician and that she could have performed her job in a way that was consistent with the physician-imposed restriction.[11] DCI argues that "sedentary" was inconsistent with the essential functions of her job that required being on her feet all day, with the ability to move quickly to assist donors with adverse reactions, and with the required periodic checks on the donor floor. LeNeau argues these functions were not necessarily essential to the physician substitute position.

LeNeau also argues that although her workability form prohibited use of her left arm, this restriction only meant she was not allowed to use her left shoulder. She claims that it was her understanding that she had the use of her hand and elbow (LeNeau Dep. 102:21-103:3) and that this range of function would have allowed her to perform all parts of her job that required two hands. DCI argues that without her left arm, LeNeau would not have been able to perform physical examinations of donors or provide appropriate care to donors who experienced adverse reactions.

Given DCI's ability to accommodate Leneau's prior work restrictions, it is unclear – in the absence of an interactive process – if it could have accommodated the final restrictions without an undue hardship. Although DCI now claims that LeNeau's job

---

[11] LeNeau notes that "sedentary" was defined on her previous workability formed as "Lifting 10 pounds maximum and occasionally lifting or carrying articles such as dockets, ledges, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met." (*See* Dep. Exs., Ex. 18.)

description was incompatible with the restrictions, this assertion alone does not resolve the issue. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 787 (8th Cir. 2004) (noting that if an employer's description of a position was conclusive, employers could escape liability "simply by defining job duties in a manner that excludes disabled employees"). The Court concludes that there is a factual question about whether a reasonable accommodation could have allowed LeNeau to perform as a physician assistant. Because a reasonable jury could conclude there were accommodations that would have allowed LeNeau to perform the essential function of her job as a physician substitute,[12] the Court will deny DCI's motion for summary judgment on LeNeau's failure to accommodate claim.

## III. LENEAU'S RETALIATION CLAIM

LeNeau also claims that DCI retaliated against her by terminating her because of her request for reasonable accommodation, in violation of Title I of the ADA. The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an

---

[12] "[B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations." *Fjellestad*, 188 F.3d at 953 (quoting *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).

investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Retaliation claims are analyzed under the *McDonnell Douglas* framework.[13]

First, LeNeau must establish a *prima facie* case of retaliation. Once LeNeau establishes a *prima facie* case, the burden shifts to DCI to show a non-retaliatory reason for her termination. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). If DCI can show a legitimate, non-retaliatory reason for LeNeau's termination, the burden returns to LeNeau who is then obliged to present evidence that (1) creates a question of fact as to whether DCI's reason was pretextual and (2) creates a reasonable inference that DCI acted in retaliation. *Id.* "Retaliatory intent is the centerpiece of retaliation claims . . . ." *Peebles*, 354 F.3d at 770.

### A. *Prima Facie* Case

To establish a *prima facie* case of retaliation, LeNeau must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity. *Stewart*, 481 F.3d at 1043. For the purposes of this motion, DCI concedes that LeNeau engaged in a statutorily protected activity (by requesting a reasonable accommodation) and that she suffered an adverse employment action. The

---

[13] LeNeau could also make a claim of discrimination by presenting direct evidence. *See Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). Because she submits no direct evidence of retaliation, the Court must analyze LeNeau's retaliation claim under the three-step framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802 (1973); *see id.*

only issue is whether LeNeau can establish a causal connection between her request for reasonable accommodation and her termination.

LeNeau requested an accommodation by dropping off a workability form a mere three days before her termination. The Eighth Circuit has "discounted, albeit with qualification, the possibility that mere temporal proximity between protected act and adverse employment action can establish the necessary causal connection . . . ." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). But where a protected act and an adverse action are very close in time, a causal connection may be found. *See id.* The Court finds that the temporal proximity establishes a causal connection between LeNeau's request for accommodation and her termination and that LeNeau has established a *prima facie* case of retaliation.

### B. DCI's Nondiscriminatory Reason

DCI argues that it terminated LeNeau because it believed her work restrictions to be permanent. It presents evidence from four employees, each stating that they believed her restrictions to be permanent at the time of her termination. (Decl. of Patrick Willingham ¶ 3, May 24, 2012, Docket No. 17; Unger Decl. ¶ 4; Dolsen Decl. ¶ 7; Friedman Decl. ¶ 7.) But several of LeNeau's previous workability forms requiring temporary restrictions did not have end dates. Moreover, although in the past DCI had engaged in an interactive process with LeNeau to determine if reasonable

accommodations were possible,[14] after her final workability form, DCI terminated her without such a process.

An employer's responses to a request for accommodation are probative as to whether it harbors animosity toward an employee due to their disability. *See Finan v. Earth Tools, Inc.*, 565 F.3d 1076, 1080 (8th Cir. 2009); *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 834 (8th Cir. 2000) ("Failing to provide an employee with reasonable accommodations can tend to prove that the employer also acted adversely against the employee because of the individual's disability.") Construing the facts in the light most favorable to LeNeau, the Court finds that DCI's **immediate** termination of LeNeau without providing her any opportunity to explain her limitations or engage in an interactive process is evidence of animosity toward LeNeau due to her disability. Because the Court finds that there is a factual question about whether DCI's termination of LeNeau was motivated by retaliatory intent, DCI's motion for summary judgment on LeNeau's retaliation claim will be denied.

In conclusion, the Court emphasizes that Congress enacted the ADA to allow people with disabilities equal opportunities in employment *See generally* 42 U.S.C. §§ 12101, 12112. In order for the Act to be effective, both the employee and the employer must be willing to engage in a process to determine the best way for a disabled employee to perform her job, if possible. *See id.* § 12112(b)(5)(A). Where, as here, an employer appears to have been unwilling to engage with a disabled employee to

---

[14] At oral argument, LeNeau's counsel also stated that DCI had consistently worked with LeNeau's qualified rehabilitation consultant to find ways to accommodate her previous restrictions.

determine if accommodations were appropriate, Congress's purposes are frustrated. Because the record indicates a material fact dispute concerning the interactive process, this case must be presented to a jury as factfinder.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that DCI Plasma Center of Duluth, LLC's Motion for Summary Judgment [Docket No. 12] is **DENIED**.

DATED: September 17, 2012                      ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                               United States District Judge